**APPALACHIAN POWER COMPANY,**
Petitioner

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

**Town of Richlands, Virginia,
et al., Intervenors.**

**Nos. 94–1411, 95–1612.**

United States Court of Appeals,
District of Columbia Circuit.

Argued November 15, 1996.

Decided December 17, 1996.

Edward Berlin argued the cause for petitioner. Kenneth G. Jaffe, Michael E. Ward and Edward J. Brady were with him on the briefs.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. Jerome M. Feit, Solicitor, was with him on the brief.

Jill M. Barker argued the cause for intervenors. Frederick H. Ritts and John S. Moot were with her on the brief. Cheryl M. Foley entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

Section 211 of the Federal Power Act ("FPA"), 16 U.S.C. § 824j (1994), authorizes the Federal Energy Regulatory Commission to order an electric utility with transmission capability to "wheel" electricity, i.e., to provide transmission services for the electric power of other providers. Here FERC exercised this authority and ordered the Appalachian Power Company ("Appalachian" or "APCo") to transmit electricity that a group of Virginia municipalities (the "Municipals"), wholesale electric customers of Appalachian, had contracted to buy from another supplier, PSI Energy, Inc. Appalachian argues that this order is without authority because § 211(c) prohibits any wheeling order that requires the wheeling utility "to transmit . . . an amount of electric energy which replaces any amount . . . required to be provided . . . pursuant to a contract . . . ." § 824j(c)(2). Although we uphold most of FERC's analysis and treatment of the contracts between Appalachian and the Municipals, we remand the case to FERC because it failed to consider the nature of Appalachian's obligation to provide power, and therefore did not properly consider whether § 211 barred a transmission order under the circumstances presented here.

\* \* \*

In 1986 the existing full requirements contracts between Appalachian and the Municipals expired. After extensive negotiation, each of the Municipals in 1987 executed a ten-year Energy Service Agreement ("agreement" or "ESA") with Appalachian. The agreements are identical except as to the volumes for various items (such as Appalachian's obligation to provide power), and we

will use the agreement with Danville as our example, as have the parties. The agreements provide for Appalachian to wheel power purchased by the Municipals from the Southeastern Power Administration ("SEPA") and are, to that extent, clearly not "full requirements" contracts, i.e., ones by which the purchaser is to buy all its power from the contracting utility. Appalachian contends that apart from the SEPA provision the agreements are for full requirements, while the Municipals argue that they permit them to buy substantial blocks of power from other sources.

The divergence of viewpoint was brought to a head in June 1993, when the Municipals applied to FERC for an order requiring Appalachian to provide transmission service for 50,000 kilowatts ("KW") of power supplied under an agreement they had reached with PSI.[1] Under Appalachian's view of the contract, it was obliged to supply all the Municipals' power, and they were reciprocally bound to take all their power from Appalachian. (In both cases, "all" means all power apart from the SEPA portion, an exception that for the rest of the opinion we treat as implicitly understood.) This would clearly trigger § 211(c)(2)'s bar. Under the Municipals' reading of the agreements, however, it appeared that the bar would be inapplicable. (As we shall see, that is not necessarily true.) The Commission concluded that because the agreements were ambiguous it could not resolve the § 211 question, and it therefore ordered a hearing before an ALJ to look into extrinsic evidence. *City of Bedford,* 64 FERC ¶ 61,381 at 63,640 (1993).

Looking at the language of the contracts and the extrinsic evidence, the ALJ concluded that the agreements were not full requirements contracts, and that the Municipals had "the option of substituting alternative, non-SEPA sources of power and energy ... for power and energy purchased from APCo." *City of Bedford,* 65 FERC ¶ 63,017 at 65,107 (1993). The Commission adopted the ALJ's reasoning with minor exceptions. *City of Bedford,* 66 FERC ¶ 61,186 (1994), rehearing

denied, *City of Bedford,* 67 FERC ¶ 61,063 (1994). Accordingly it issued an order under § 211 requiring Appalachian to transmit the PSI power. *City of Bedford,* 68 FERC ¶ 61,003 (1994), rehearing denied, *City of Bedford,* 73 FERC ¶ 61,322 (1995).

In a related proceeding, the Municipals petitioned FERC to use its contract-modifying authority under § 206 of the FPA, 16 U.S.C. § 824e (1994), to alter the agreements so as to prevent Appalachian from charging the Municipals for the power they proposed to buy from PSI. FERC granted the Municipals' request. *City of Bedford,* 68 FERC ¶ 61,004 (1994), rehearing denied, 73 FERC ¶ 61,321 (1995).

### Interpreting the Contract

#### Contract Ambiguity

 In reviewing FERC's interpretation of a contract, we apply the deference principles of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1135–36 (D.C.Cir. 1991). Thus, by analogy to the "first step" inquiry as to whether a statute is ambiguous, we resolve the equivalent question—whether the contract is ambiguous—*de novo.* *Id.* Only if it is ambiguous can FERC consider extrinsic evidence as an aid to interpretation. *Consolidated Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1546 (D.C.Cir.1985) (citations and quotations omitted). We agree with FERC that the ESAs are ambiguous.

The ESAs do not explicitly say whether or not they create a full requirements obligation (excluding the SEPA allocation). Omission of those words does not, however, automatically make a contract ambiguous on the subject. The Municipals rest their argument that the ESAs permit them to reduce their "Contract Capacity," and thereby purchase power from PSI, on the following language of § 3.2:

> The Customer shall have the option to reduce the Contract Capacity for billing

---

**1.** The Municipals are members of the Blue Ridge Power Agency, which was established in 1988 for the purpose of supporting the power supply acquisition activities of its membership. The Mu-

nicipals have assigned portions of their ESAs to Blue Ridge. For simplicity, however, we use the term "Municipals" for all purchasers under the agreements at issue.

purposes, provided notice of such reduction is given in writing in accordance with the following schedule:

| 0 to 15% reduction | 1 year's notice |
|---|---|
| 15 to 25% reduction | 2 year's notice |
| 25 to 50% reduction | 3 year's notice |

Such Contract Capacity reductions will be subject to the Customer submitting substantial data that demonstrates a significant change in the Customer's purchased power requirements from the Company. Reductions in capacity requirements due to weather conditions will not be cause for such adjustment.

Although this section clearly provides the opportunity for the Municipals to reduce their contract capacity, the conditions under which they can do so are not clearly expressed. Appalachian argues that the need to submit "substantial data that demonstrates a significant change in the Customer's purchased power requirements" limits a Municipal's ability to exercise its § 3.2 rights to occasions where its demand for power vel non decreases. In contrast, the Municipals argue that any reason (excluding weather) suffices under § 3.2, including a decision to choose a different power provider.

The agreements' billing provisions deepen the confusion. An excerpt of Appalachian's tariff (attached as Exhibit A to the agreements) sets forth the Demand Charge and the Energy Charge, expressed in dollars for "each KW of Billing Demand" and for "each KWH of Billing Energy," respectively. Billing Demand and Billing Energy in turn are defined in § 3.4 of the agreements:

> The Customer's monthly Billing Demand will be equal to the single highest 30–minute kiloWatt demand measured during the month, reduced by the Customer's allocation of SEPA capacity.... The Customer's monthly Billing Energy will be equal to the Customer's total monthly metered kiloWatthour energy requirement, reduced by the monthly kiloWatthours of energy made available to the Customer by SEPA....

The effect of this is to charge the Municipals for any non-SEPA electricity that passes through Appalachian's meter. Given that the Municipals are electrically connected only to Appalachian's transmission system and that no plans exist to build additional transmission facilities, Appalachian concludes that § 3.4 makes clear that the ESAs are full requirements contracts. Finally, Appalachian argues that the provision reducing billing for "energy made available ... by SEPA" should be interpreted under the principle *expressio unius est exclusio alterius* to foreclose the possibility of reductions for any other reason.

Standing alone, § 3.4 does appear to require the Municipals to pay Appalachian for any power that goes through Appalachian's meter, regardless of where the power originates—effectively creating a full requirements contract. But such a reading of § 3.4 would render the reduction privileges in § 3.2 virtually meaningless, because, except to the extent a § 3.2 reduction reflected a decrease in a Municipal's actual power needs, it would still be required to pay for power that it was no longer taking from Appalachian. Appalachian does not suggest that any of the Municipals was facing a possibility of an economic meltdown so devastating that it would reduce demand by 50%. Thus the buyers' right to cut contract capacity by this amount was, on its reading, effectively worthless.

Appalachian counters that the ability to reduce contract capacity is not worthless. Rather, Exhibit A sets a floor under the monthly Demand Charge, amounting to 50% of "contract capacity." See also § 3.2 (saying that "monthly Billing Demand in no event will be less than fifty percent (50%) of the initial Contract Capacity"). But as § 3.2 by its terms gives the Municipals an option only "to reduce the Contract Capacity for billing purposes," it literally reduces only the billing floor, and leaves in place the Demand Charges based on actual flow through the meter, regardless of the source of the power. Thus, although Appalachian makes much of the Municipals' power to reduce their minimum bills, its interpretation merely underscores the Municipals' argument that Appalachian's view, under the real-world circumstances of the Municipals, leaves the § 3.2 entitlement to reduce utterly without value. Accordingly, we agree

with the Commission that the agreements are ambiguous.

### The Municipals' Obligation

 This court applies a deferential standard of review to Commission interpretation of ambiguous contracts, but the Commission's interpretation must be " 'amply supported both factually and legally.' " *Williams Natural Gas Co. v. FERC*, 90 F.3d 531, 533 (D.C.Cir.1996) (citations omitted). Examining the contract in light of evidence as to the course of negotiation and conduct under the agreements, FERC concluded that the Municipals had no obligation to buy all of their power from Appalachian. The evidence is strong enough for us to uphold this conclusion.

The predecessor contract to the Danville ESA stated that "the Company agrees to furnish and sell to the Customer and the Customer agrees to take from the Company and pay for all the electric energy in excess of that generated by the Customer." Almost identical language was proposed by Appalachian when negotiating the current ESA. 65 FERC at 65,094–95. This language was rejected by the Municipals in part because "it would have prevented them from purchasing power and energy from third parties." *Id.* at 65,095. The final language of the ESA stated only that "[Appalachian] may supply the Customer's needs for capacity and energy ..." and that "[Appalachian] agrees to sell and deliver electric power and energy to the Customer...."

The ALJ found that the Municipals intended for § 3.2 to permit reduction of contract capacity for any reason other than weather and found that this understanding was communicated to Appalachian. *Id.* at 65,097–98. In addition, according to the ALJ, this interpretation was consistent with the plain meaning of § 3.2 and with Appalachian's course of conduct. Most significantly, Appalachian had argued in a 1990 rate proceeding that it needed a higher return on equity because of

the threat of competition, asserting that "alternative sources of power are available to APCo's wholesale customers and that [the Municipals are] actively pursuing alternative sources of power."

Finally, the ALJ found that the parties did not intend for § 3.4 to apply where power was provided by competitors. Rather, the parties intended that billing would be negotiated at the appropriate time. And § 9.1 provided protection, in the form of recourse to the Commission, in case the parties could not come to an agreement:

> Each party expressly recognizes that the other party herein shall, at any time ... be entitled unilaterally, to take such action before, or make such filings with [FERC] with respect to any rate.... [T]he phrase "rate" includes all provisions relating to the rates ... and set forth in Section 3.4 hereof.

Appalachian urged FERC to read this as boiler-plate language that merely reiterated the existing rights of the parties to raise issues under §§ 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d & 824e (1994). The ALJ rejected that view on the ground that it would render § 9.1 (or an alternative provision that does have a boiler-plate ring to it) superfluous.[2] 65 FERC at 65,102–03. Instead, the ALJ interpreted § 9.1 as designed to permit the parties to seek amendment of the billing provisions if the need arose. *Id.*

We think FERC was reasonable in its conclusion that the Municipals were not forbidden by the contract from purchasing power from PSI, and that they could expect billing relief if they did so.

### Appalachian's Obligation

 For purposes of § 211(c)(2), however, the important question is whether Appalachian has an obligation to provide the power sought to be transmitted by PSI to the Municipals. It says:

**2.** The other provision is § 3.3 of the ESA, which says:

It is expressly understood that nothing herein contained shall be construed as affecting in any way the right of the Company to unilaterally make application to the FERC for a change in

rates under Section 205.... It is also expressly understood that nothing herein contained shall be construed as affecting in any way the rights of the Customer with regard to any provision of this Agreement under Section 206....

No order may be issued under subsection (a) or (b) of this section which requires the transmitting utility ... to transmit ... an amount of electric *energy which replaces any amount of electric energy—*

(A) *required to be provided to such applicant pursuant to a contract during* such period.

(B) currently provided to the applicant by the utility subject to the order pursuant to a rate schedule on file during such period.... [3]

16 U.S.C. § 824j(c)(2) (emphasis added). Appalachian's claim here is that the agreements, regardless of the duties they impose on the *Municipals,* clearly require *Appalachian* to provide power that would be replaced by the power wheeled pursuant to the transmission order. Accordingly, it says, the wheeling order violates § 211(c)(2).

FERC recognized that Appalachian's obligations were fundamental to resolving the § 211 issue. It turned, however, to a passage of § 3.2 stating that:

In the event the Contract Capacity is reduced by the Customer's notice, the Company's capacity obligation in Section[s] 1.1 and 2.1 herein will be correspondingly reduced by the amount of the reduction in Contract Capacity.

The Commission read this provision as saying that

when the customer elects to reduce the contract capacity, Appalachian's maximum capacity obligation set out in section 1.1 will be correspondingly reduced.

| | Adjusted Service Obligation |
| --- | --- |
| | (in KW) |
| Bedford | 43,900 |
| Danville | 175,000 |
| Martinsville | 48,600 |
| Richlands | 17,500 |

64 FERC at 63,639. According to FERC, this language disposed of any need for further examination of Appalachian's obligations to the Municipals. *Id.*

If contract capacity and Appalachian's capacity obligation (alternatively referred to as a "service obligation" in § 1.1) were the same, then equal reductions of each would leave them both the same. But because the agreements set the service obligation at levels *above* contract capacity, there is a gap in the Commission's reasoning.

In the Danville agreement, for example, § 1.1 establishes Appalachian's service obligation at 200,000 KW. Under § 3.1, however, contract capacity is initially set at 149,000 KW and thereafter varies according to the maximum 30–minute KW demand imposed by the customer (with various qualifications). Here is Appalachian's explanation of how this divergence between creates a problem under § 211(c)(2):

Prior to the Commission's orders under review, APCo's service obligation to Danville was 200,000 KW. Danville's Contract Capacity at the time of the proceedings below was 171,200.... Danville proposed to purchase 25,000 KW from PSI and to reduce its Contract Capacity by a like amount. This would reduce APCo's service obligation to 175,000 KW. Nonetheless, regardless of whether Danville buys 25,000 KW from PSI, APCo remains obligated to deliver at least 175,000 [KW] ... a quantity in excess of Danville's expected demand.

Reply Br. at 12–13 (citations omitted). This reasoning applies to each of the Municipals:

| | Maximum 30–minute KW Demand Including PSI power |
| --- | --- |
| | (in KW) |
| Bedford | 41,700 |
| Danville | 171,200 |
| Martinsville | 44,000 |
| Richlands | 17,500 |

Thus, putting aside the effect of an unforeseen increase in demand, the power to be provided by PSI would always replace power that Appalachian has an obligation to pro-

---

**3.** FERC rejected Appalachian's § 211(c)(2)(B) claim below, and Appalachian does not pursue it here.

vide. Neither FERC nor the intervenors dispute the accuracy of this example, nor do they argue that the Municipals will experience a significant increase in demand.

During oral argument, the FERC attorney suggested that FERC may have interpreted "correspondingly reduced by the amount of the reduction in Contract Capacity" to mean that the service obligation would be reduced to the same level as contract capacity. This is an implausible twist of the language, which calls for reduction of service obligation *by* an equal amount. Further, as the parties established an initial disparity between the contract capacity and the service obligation, most likely to account for the unpredictability of the Municipals' demand and to give them a reserve, it would be reasonable for them to wish to retain the disparity. Finally, the record gives no hint that FERC made the interpretation suggested at oral argument.

In a post-argument submission, the Municipals make two key points. First, they call our attention to a passage that, they say, makes clear that the Commission relieved Appalachian of any responsibility for the power that the Municipals will receive from PSI:

> We will grant Appalachian's request to terminate service responsibility for the loads removed by the Virginia Municipals pursuant to the reduction provisions of the ESAs. [The Municipals have] chosen to redefine [their] traditional relationship with Appalachian. Having chosen to participate in the evolving bulk power market, [they] must accept both the risks as well as the rewards of this voluntary decision to leave the security of its current power supplier.

68 FERC at 61,020.

*If* the passage reduced Appalachian's service obligation to contract capacity (in turn as reduced pursuant to the Municipals' elections under § 3.2), it would solve the § 211(c) problem, though at the expense of raising issues as to whether the Commission had authority to revise the parties' agreement so drastically and whether the Municipals would

like their reserve to be extinguished. But we need not address those issues, because it is not apparent that the reduction that the passage directs was anything of the sort; so far as appears, all the Commission refers to is the reduction of the service obligation *by* the amount of the reduction in contract capacity. See *id.* at 61,020 n. 23.

More interestingly, the Municipals make what we might call a tracing claim. Characterizing the excess of service obligation over contract capacity as "Reserves Provided by APCO," they treat that as a sort of icing on the power cake, as shown in the graph attached as Appendix A to this opinion. For the era *before* the shift to use of PSI, they depict, below the reserve icing, a single layer of 171,200 KW of "peak demand served by APCO"; for the period *after* the start of purchases from PSI, they depict two layers, 146,200 KW from Appalachian and 25,000 KW from PSI, totaling 171,200 KW. By conceptually separating the service obligation into "peak demand" and "reserves," and tagging the reduction as belonging solely to the "peak demand" component, the Municipals are able to argue that the 25,000 KW from PSI do not replace power that Appalachian is any longer obligated to supply.

The trouble with this analysis, of course, is that it is solely the Municipals', not FERC's. We cannot know whether the Commission would adopt it (after it has been subject to criticism by Appalachian), and it would therefore be improper for us to review it here. *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95, 63 S.Ct. 454, 461–63, 87 L.Ed. 626 (1943). We must therefore remand the case for the Commission to address Appalachian's contention.

*The Modification Order*

■ Appalachian makes two arguments relating to the Commission's orders modifying the agreements in such a way as to deprive Appalachian of authority to charge (under § 3.4) for the power provided by PSI. First, Appalachian argues that the modification was arbitrary and capricious, because § 3.4 as written is perfectly consistent with a full requirements contract, which in turn is not inherently unjust or unreasonable. But this is just a restatement by Appalachian of

its argument that § 3.4 renders the agreements full requirements contracts. If the Commission properly found the contracts not to be ones for full requirements, as we have just held, then it was reasonable for it to decide that the billing provision is unjust and unreasonable to the extent that it effectively requires the Municipals to pay Appalachian for PSI power.

■ Second, Appalachian argues that the modification is inconsistent with the policies set forth in the Commission's Order No. 888, "Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities," 61 Fed.Reg. 21,540 (1996) (to be codified at 18 C.F.R. § 37). Specifically, Appalachian points to the Commission's observation that if "an existing requirements contract includes an explicit provision for payment of stranded costs or an exit fee, we will assume that the parties intended the contract to cover the contingency of the buyer leaving the system." 61 Fed.Reg. at 21,641/3. In such a case the Commission would simply enforce the agreement, rather than apply its administratively adopted stranded costs rule.

■ There are two serious flaws with Appalachian's argument here. First, ordinarily inconsistency with a *later* order is not grounds for upsetting the one under review. *Altamont Gas Transmission Co. v. FERC,* 965 F.2d 1098, 1101–02 (D.C.Cir.1992). While the earlier order may provide a basis for claiming that the later one swerved from agency precedent without adequate explanation, see *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), the reverse is obviously not true. Second, the Commission did not read § 3.4 as establishing an exit fee. Rather, as § 3.4 would allow Appalachian to charge the Municipals for every bit of the demand in fact satisfied by PSI, the Commission viewed it as a provision in conflict with the Municipals' entitlement to reduce their takes pursuant to § 3.2. Accordingly, we see no genuine conflict with Order No. 888.

＊ ＊ ＊

Although we uphold the Commission's modification order, we reverse and remand the transmission order for consideration of Appalachian's argument that it violates § 211(c) by requiring it to transmit power that it is required to supply under the contracts, even as modified. The modification order will, of course, remain meaningless unless the Commission establishes adequate authority under § 211 and issues a new transmission order, or unless Appalachian voluntarily agrees to transmit the PSI power.

*So ordered.*

Appendix A
Municipals' Theory of Reduction in Service Obligation