Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued March 13, 2003    Decided April 25, 2003

No. 02-1002

PACIFIC GAS AND ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHERN CALIFORNIA POWER AGENCY, ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

————

*John S. Moot* argued the cause for petitioner. With him on the briefs was *Kathryn Kavanagh Baran*.

*Timm Abendroth*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

—————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Daniel I. Davidson* argued the cause for customer intervenors. With him on the brief were *Robert C. McDiarmid, Lisa G. Dowden, Peter J. Hopkins, Glen L. Ortman, Michael N. McCarty, Wallace L. Duncan, James D. Pembroke, Richmond F. Allan* and *Michael Postar*. *Harvey L. Reiter* entered an appearance.

*Robert S. Greenspan* and *Christine N. Kohl*, Attorneys, U.S. Department of Justice, were on the brief for federal intervenors.

Before: RANDOLPH and ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Pacific Gas and Electric Co. disputes the meaning of two agreements between it and Western Area Power Administration, a federal entity that operates hydroelectric projects in the West. The agreements (a contract and an amendment to the contract) provide "load shaping" for Western, i.e., give it access to PG&E's non-hydro power to balance Western's hydro supplies and enable it to offer customers firm service; and they give PG&E access to Western's excess hydro power at prices lower than PG&E's average costs.

Under the agreements, the rate that PG&E charges Western for energy is based on PG&E's costs for thermal generation, i.e., producing power from its fossil fuel and nuclear plants. These costs became less obviously suitable as markers when California restructured its energy market in 1996. PG&E then divested itself of most of its generation facilities, retaining only a single nuclear power plant and a small number of gas-fired facilities. Although PG&E still produces three times as much energy as Western requires, its remaining plants are ill-suited to provide load-shaping services for Western, and it now relies on market purchases (in whole or

in part) for the energy it supplies Western. It would like to be able to charge Western the same price it pays.

The California restructuring also established an "Independent System Operator" ("ISO"), to which PG&E turned over the operation of its transmission facilities. As a result PG&E is now billed for several new services. It would like to have Western cover some of these costs.

Accordingly it filed a new rate schedule with the Federal Energy Regulatory Commission under § 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d (2000), changing its energy rates to reflect the new sources (which are currently much more expensive) and its transmission rates to reflect the new ISO costs. FERC accepted the proposal for filing but suspended the rate increases for five months, as permitted by the statute, and set the matter for an evidentiary hearing. 95 FERC ¶ 61,273 (2001). As the right of a utility to effect rate changes via § 205 may be overridden by a contract between the parties, see *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 353 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), the initial—and fatal—issue was whether the agreements between PG&E and Western barred the filing.

The ALJ ruled in favor of Western, finding such a bar. She held that the agreements unambiguously precluded PG&E from using § 205 to change energy rates except in three specific circumstances, none of which applied. *Pacific Gas & Elec. Co.* ("ALJ Opinion"), 96 FERC ¶ 63,043, at 65,282–91 (2001). As to transmission rates, she found that PG&E had not complied with the contractual condition precedent of participating in a "joint review" of relevant cost information with Western. *Id.* at 65,292–93. FERC affirmed in a very brief order, 97 FERC ¶ 61,082 (2001), and denied PG&E's petition for rehearing, 97 FERC ¶ 61,335 (2001).

As to the energy rates, we affirm. As to the transmission rates, we remand the case for the Commission to reexamine the joint review issue, on which the ALJ's opinion muddled the governing standard and failed to address seemingly significant fact claims.

4

* * *

The controlling agreements are Contract No. 14–06–200–2948A (the "Contract"), executed July 31, 1967, and the "Energy Account No. 2 and Capacity Account Repurchase Rate Letter Agreement" (the "Letter Agreement"), dated February 7, 1992. Article 32 of the Contract provides for "joint review" of the rates every five years, and, if the review fails to yield agreement, allows either party to seek FERC approval for changes. PG&E invoked Article 32 in filing under § 205 of the FPA for changes to both its energy and transmission rates. As to energy rates, the issues revolve entirely around new restrictions that FERC believed were added by the Letter Agreement; as to transmission rates, they revolve entirely around Article 32's joint review process.

In reviewing FERC's interpretation of contracts we first determine de novo any unambiguous meaning of the contract; deference comes into the picture only if we find an ambiguity, in which case we defer to any reasonable resolution by FERC. *Appalachian Power Co. v. FERC*, 101 F.3d 1432, 1435, 1437 (D.C. Cir. 1996); cf. *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984). Another ambiguity-related rule, on which all parties here agree, is that absent a finding of ambiguity parol evidence is inadmissible (even to determine ambiguity). See, e.g., *Appalachian Power Co.*, 101 F.3d at 1435; cf. *Appalachian Power Co. v. Fed. Power Comm'n*, 529 F.2d 342, 347–48 (D.C. Cir. 1976). FERC's findings of fact are conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b) (2000).

* * *

*Energy rates.* The Letter Agreement totally revamped the way energy rates are calculated under the Contract. Although the Contract's Article 32 provides for amendment via § 205, amendments *of the Contract* alone would be meaningless as to energy rates unless they could also bring about changes in the Letter Agreement. Thus the key question is whether the Letter Agreement itself limits PG&E's authority

to use Article 32 to change the *Letter Agreement*'s energy rate terms.

The key language is found in two paragraphs of § 33 of the Letter Agreement:

> Except as expressly provided herein, nothing in this Letter Agreement shall be construed as affecting in any way PG&E's right to make unilateral application to the FERC under Section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder to make [1] the changes in rates, terms and conditions as set forth in Section A(10) of Appendix A, and [2] Paragraph 11 of Appendix C, or [3] to make changes to the service charges set forth in Paragraph 19 as provided in Article 32 of [the Contract]. *Otherwise, this Letter Agreement shall not be subject to change pursuant to Section 205 of the Federal Power Act unless agreed by the Parties.*

> Except as otherwise provided herein, nothing in this Letter Agreement shall be construed as affecting in any way the rights of Western or PG&E under the Federal Power Act. . . .

Letter Agreement § 33 (emphasis and bracketed enumeration added). We refer to the above as the first and second paragraphs of § 33, although in fact there is an irrelevant prior paragraph.

The ALJ found that this language unambiguously limits PG&E's right to file under § 205 for changes in the Letter Agreement's energy rates, leaving only the three listed instances. PG&E agrees that it authorizes § 205 filings in these instances, but argues that these § 205 rights are in addition to rather than instead of the rights granted under Article 32 of the Contract.

Rather than attempting to prove that its interpretation is correct, PG&E directs most of its fire to the ALJ's finding that the Letter Agreement was unambiguous, a ruling that barred admission of PG&E's parol evidence. It first argues that FERC acknowledged ambiguity by ordering a hearing

on the matter. But while a remand for a hearing may often indicate that a contractual provision is ambiguous, it may simply mean that it is difficult and complicated—as indeed it is.

The listing of preserved § 205 rights in the first quoted sentence of § 33 is clearly directed at preventing an implied limitation of those rights. But it does not bode well for PG&E's other § 205 rights since they are not expressly preserved and might elsewhere be expressly or impliedly limited. The next sentence establishes that restriction: "Otherwise, this Letter Agreement shall not be subject to change pursuant to Section 205 of the Federal Power Act unless agreed by the Parties." This says rather clearly that PG&E can use § 205 to change the Letter Agreement's energy rate computation methods only in the three enumerated categories.

PG&E argues that the clarity of that sentence is undermined by the first sentence of the next paragraph: "Except as otherwise provided herein, nothing in this Letter Agreement shall be construed as affecting in any way the rights of Western or PG&E under the Federal Power Act...." It says that these two "otherwise" sentences "either cancel each other out—as mirror images of one another—or they are utterly ambiguous, thereby necessitating the consideration of parol evidence respecting them." Petitioner's Opening Brief at 26–27. PG&E's argument would be on much stronger footing if the second "otherwise" sentence lacked the opening phrase, "Except as otherwise provided herein...." As it is, the sentence acknowledges that other provisions in the Letter Agreement affect the rights of the parties under the Federal Power Act. That the second "otherwise" sentence begins a new paragraph further suggests that it leaves in place the prior paragraph's explicit restriction of § 205 rights.

The two paragraphs invite a straightforward and internally harmonious construction giving effect to each part. Cf. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). The "otherwise" sentence of the first paragraph explicitly limits all § 205 rights to change the Letter Agree-

ment, with three enumerated exceptions; the "otherwise" sentence of the next paragraph assures retention of all FPA rights but the ones specifically excepted. One of the rights specifically excepted is the right of PG&E to make a § 205 filing for any kind of change other than the three listed. There is no need for recourse to PG&E's idea of mutual cancellation or ambiguity.

Besides, § 33's third specific authorization for § 205 filings—"to make changes to the service charges set forth in Paragraph 19 as provided in Article 32 of [the Contract]"—would be wholly redundant if Article 32 rights were preserved in their entirety. PG&E responds that this clause is best interpreted as providing a right to file under § 205 *at any time*, i.e., free of Article 32's provision that it may occur only once "every five years." But PG&E is wrong; the clause states that the changes in question may be made "as provided in Article 32," indicating that the process is subject to Article 32's restrictions. The specific incorporation of one subset of Article 32 rights demolishes the argument that all Article 32 rights are preserved.

PG&E argues that various other provisions of the Letter Agreement make that agreement's effects on Article 32 ambiguous. It points to the Letter Agreement's opening sentence, saying, "This letter agreement . . . is made consistent with the intent of Article 32 of [the Contract]. . . ." PG&E argues that it would make little sense to say that an agreement is consistent with a clause that it intends to restrict. But this clause introduces the Letter Agreement, and simply states the source of authority to make the amendment— Article 32's provision that the Contract be "jointly reviewed, and adjusted as appropriate." It is not saying that that the Letter Agreement in no way amends Article 32.

PG&E also points to § 31 of the Letter Agreement: "Except as provided herein, nothing contained in this Letter Agreement shall modify any provisions of [the Contract]. In the event of a conflict between this Letter Agreement and [the Contract], [the Contract] shall govern." PG&E reasons that these sentences should mean that unless a clause of the

Letter Agreement specifically amends the Contract, any conflict between the two agreements is resolved in favor of the Contract. If PG&E means that any amendments of the Contract must start, "We amend § x," then PG&E is wrong. The Letter Agreement created many new terms without explicitly labeling each one an amendment of the Contract—much less mentioning the specific provisions amended. If PG&E means only that in the case of ambiguity regarding whether the Letter Agreement changes something, the original contract governs—a more appropriate interpretation of the language—its argument takes it nowhere. Here, it is clear that the Letter Agreement amended terms of the original contract, though without introducing each change with a drum roll.

To support its arguments that the text of the Letter Agreement is ambiguous, PG&E argues that it would make no sense for it to give up its Article 32 rights in exchange for a mere fine-tuning of the energy price computation. And it says that under FERC's view it gives up its rights to seek energy rate changes through FERC without Western giving up its parallel Article 32 rights. The one-sidedness occurs because Western is not a public utility within the meaning of the FPA; as such it never had any § 205 rights to give up. See ALJ Opinion, 96 FERC at 65,284. Thus the parties seem to agree that any non-agreed change to energy rates could come only through an exercise by FERC of its power under § 206, 16 U.S.C. § 824e; but they appear to disagree as to which of such changes must satisfy the *Sierra-Mobile* doctrine's very demanding "public interest" standard. See, e.g., *Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998). PG&E thinks that FERC will likely require it to meet the public interest standard while allowing Western to secure changes under a more lenient one. FERC did not address these interesting collateral issues, and we need not.

Whatever the parties' residual rights to seek changes through § 206, PG&E has by no means shown that the natural construction of the Letter Agreement is so lopsided as to be implausible. The Letter Agreement greatly simplified the previous system for determining rates. PG&E did

reserve the right to make § 205 filings in three specific areas, which may then have been seen as critical. Additionally, Western limited its right to request a hearing in certain circumstances. See Letter Agreement § 33. In short, the Letter Agreement is not so obviously unbalanced as to make us question its otherwise plain meaning.

As the parties have agreed that parol evidence is not to be admitted if the contract is unambiguous, there is no need for us, and was no need for the ALJ, to review the parol evidence tendered by PG&E. We note for the record that the evidence offered seems astonishingly weak: primarily the negotiators' failure to recall any determination to cut down PG&E's Article 32 filing rights.

PG&E has a back-up argument. It claims that even if it can't file energy rate changes under Article 32 of the Contract, it should still be able to do so under the first of the Letter Agreement's three specific exceptions. This provision gives PG&E the right to make unilateral application to FERC "under Section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder to make the changes in rates, terms and conditions as set forth in Section A(10) of Appendix A. . . ." Section A(10) of Appendix A in turn states that "[i]n the event . . . any legislative body or governmental agency takes any action that necessitates or results in changes to this Appendix A, the Parties agree to negotiate in good faith and implement changes to this Appendix A to provide concurrent and consistent modifications, as necessary." The provision then says that if the parties cannot agree on changes, they may make appropriate filings with FERC. The Commission put aside the question of whether the requisite governmental action was shown, 97 FERC at 61,397 n.4, but agreed with the ALJ's finding that PG&E's proposed changes could not qualify as "changes to this Appendix A."

Appendix A addresses various issues in calculating the costs at PG&E's thermal plants. It does so within the framework of the Letter Agreement, which in § 2(b) declares that its purpose is to establish "methodology, data sources

and procedures for the calculation of PG&E's Average Annual Thermal Capacity and Energy Production Costs." PG&E argues that its filing represents a "change to this Appendix A," as it replaces rates based on PG&E's thermal plant costs with rates based on its purchases in the open market.

We think that, at a minimum, language allowing changes "to this Appendix A" cannot cover changes substantially affecting terms *outside* Appendix A. See ALJ Opinion, 96 FERC at 65,288. PG&E's filing would do so. It would moot the entire Letter Agreement. Because of its complete substitution for Appendix A and the rest of the Letter Agreement, it would essentially "abolish and replace" the Letter Agreement, as the ALJ found. ALJ Opinion, 96 FERC at 65,289. And an example of this can be found in its de facto elimination of Appendix C, governing calculation of costs at PG&E's Diablo Canyon plant. Even PG&E concedes the point, acknowledging that its filing "proposed to *delete* Appendix C," Petitioner's Reply Brief at 20.[1]

If proposals so remote from Appendix A are "changes *to* this Appendix A," then it appears that any proposed change would qualify (so long as it met the governmental action requirement posed by the section), no matter how radically it affected the rest of the Letter Agreement and the Contract. Whatever the exact contours of what might be a change "to" Appendix A, PG&E's filing cannot qualify.

*Transmission rates.* Under the California restructuring and PG&E's ceding control of its transmission facilities to the ISO, PG&E is billed additional costs for services related to maintaining grid reliability. PG&E now wishes to charge Western for the portion of these charges relating to its energy sales to Western.

FERC and the ALJ posed a single obstacle to PG&E's § 205 filing new transmission rates—their conclusion that

[1] Although § 33 of the Letter Agreement preserves a very limited right to amend Appendix C, see § C(11), PG&E has never pretended that it encompasses the changes that PG&E has proposed.

PG&E had not met the "joint review" requirement of Article 32 of the Contract:

> Rates and charges ... shall ... together with service charges, be jointly reviewed, and adjusted as appropriate ... every five years.... Such review shall take into account substantial savings accruing to either party and applicable costs of construction and production, including changes therein and appropriate service charges, during the preceding five years. *If* the parties are unable to agree on a change of any rate or charge, the matter shall be submitted to the Federal Power Commission [predecessor of FERC] for final decision.

(Emphasis added.) PG&E argues that joint review is not a condition precedent for a § 205 filing, and that in any event it adequately engaged in joint review with Western. We reject PG&E's first argument but vacate and remand the case for further consideration of the second.

Claiming that joint review is not a condition precedent, PG&E asserts that such conditions are disfavored in contract interpretation, see, e.g., Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS § 38.13 (4th ed. 2000), and notes that there is no conditional word, such as "if," preceding the statement of the joint review covenant. But there is a word of condition that is relevant. The latter part of the provision states that "[i]f the parties are unable to agree," the matter shall be submitted to FERC. This explicitly conditions each party's right to bring a matter to FERC on the two sides having proven unable to agree. It plainly anticipates that the parties will have engaged in joint review and come to a standstill before one of them can petition FERC for review. The provision's detail on the nature of the joint review suggests an intent that the provision be effectively enforced, and PG&E's proposed alternative method of enforcement, discovery, seems less effective and likely duplicative of the parties' pre-existing rights in a § 205 hearing. See 18 C.F.R. §§ 385.401–02, 385.501 (2002). We agree with the ALJ that the language imposes a condition precedent.

Whether PG&E met its joint review obligations depends on two points—the standard of compliance, and PG&E's actual behavior. In finding PG&E in default, the ALJ rejected any notion of substantial compliance. ALJ Opinion, 96 FERC at 65,293. It quoted another ALJ opinion stating:

> [T]he *Mobile-Sierra* doctrine does not have a "substantiality" test: the terms of the contract either permit the rate increase or do not permit the rate increase.

*Id.* (quoting *Pacific Gas & Elec. Co.*, 95 FERC ¶ 63,022 at 65,211 (2001)).

This idea seems to lack sense—which may explain why FERC offered no defense either in its brief or in oral argument. It is presumably true that any behavior subject to a condition precedent is, in the end, either barred or not barred. But that truism offers no reason why an utterly trivial default should be fatal; and in fact it normally is not. See, e.g., *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 664 (7th Cir. 1995); Williston, A TREATISE ON THE LAW OF CONTRACTS § 44.52.

The case for a substantial compliance standard seems compelling here. Joint review is difficult to define and hard to measure. Unless there is some leeway, a minor defect in compliance could trigger wholly disproportionate consequences with little warning, perhaps engendering wasteful overcompliance efforts. And the party resisting any change would have an incentive to raise loads of minor requests in the hope of bringing about a single instance of imperfect compliance. So substantial compliance is enough, and the ALJ's insistence on more was not a reasonable interpretation of the contract.

The evidence of PG&E's failure to comply is hardly overwhelming. FERC focuses on its failure to provide Western the necessary data and to adequately discuss and review that data with Western. Article 32 states that review should take into account "substantial savings accruing to either party and applicable costs of construction and production, including changes therein and appropriate service charges, during the

preceding five years." All parties agree that this provision at least means that each party must have access to the preceding five years of data in the specified categories. Since the data at issue were in PG&E's possession, the question is whether PG&E adequately made it available to Western.

PG&E argues that Western has access to the relevant data for the preceding five years (1996 to 2001) since it was an intervenor in five different rate cases in which PG&E had to submit this information. See 93 FERC ¶ 61,207 (2000); 89 FERC ¶ 61,081 (1999); 87 FERC ¶ 61,218 (1999); 83 FERC ¶ 61,212 (1998); 81 FERC ¶ 61,323 (1997). Western (an intervenor in this case) argues that "telling Western where to find the information scarcely amounts to the joint review by both parties mandated by Article 32," Brief for Federal Intervenors at 35–36, while PG&E says that Article 32 does "not require [it] to act like Kinko's, making copies of the *same* documents over and over for Western," PG&E's Reply Brief at 22. We agree with PG&E. If Western had reasonably convenient access to all of the relevant information (and Western asserts no inconvenience), then PG&E has performed its duty of *disclosure*.

The briefs and the ALJ's opinion leave us unclear as to whether Western is claiming that these five rate cases did not contain all of the information required for joint review under Article 32. If that information was complete, then the ALJ's discussion about PG&E's limited *deliveries* of data is immaterial. See ALJ Opinion, 96 FERC at 65,292–93. If lack of information is to be one of the grounds for PG&E's failure to meet the joint review requirement, FERC must make clear what information has not been made available. It has not done so.

The ALJ's opinion is suffused with observations that the parties have not reviewed and discussed various points. See, e.g., *id*. at 65,293. We agree with PG&E that joint review does not require PG&E to sit down and look over Western's shoulder as it considers the information. It also does not mean that every single point needs to be discussed. Rather, the information should be made available to Western, giving

Western a chance to ask questions and raise concerns, to which, obviously, PG&E must respond clearly, forthrightly and completely. If Western expresses a reasonable desire to meet and discuss open questions, then joint review requires cooperation from PG&E. But issues need not be discussed unless a party sees a need.

PG&E apparently met with Western 21 times prior to its § 205 filing; but the bulk of these meetings, and indeed of Western's complaints to the ALJ about PG&E's defective joint review, appear to have concerned energy rather than transmission rates. See, e.g., August 8, 2001 Affidavit of Bryan W. Griess. During at least one of these meetings, PG&E discussed transmission rates and how they were derived from PG&E's costs. At this same meeting, PG&E told Western where to find the information on transmission rates, and its agent said that Western appeared satisfied with the response. See ALJ Opinion, 96 FERC at 65,292. But the satisfaction was not total. Western points to an e-mail exchange on January 4–5, 2001, in which Western's representative asked to meet with one from PG&E to discuss cost of service data. PG&E rebuffed the request, suggesting instead that they meet after the filing (presumably the § 205 filing), but also inviting Western to propose any items it wished for a technical conference scheduled for a few days later.

This e-mail refusal is clearly relevant to a conclusion that PG&E failed to substantially comply with the joint review requirement. But it is unclear whether the ALJ would have made the same decision relying on it alone—and it appears to be alone (barring a showing of inadequacies in the information made available to Western).

Accordingly we vacate the portion of the order concerning whether PG&E met the joint review requirement and remand the case for FERC's further consideration. Otherwise, we affirm.

*So ordered.*