Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 25, 2003       Decided June 6, 2003

No. 02-1034

AMEREN SERVICES COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ROLLA MUNICIPAL UTILITIES,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Douglas O. Waikart* argued the cause for the petitioner. *Alan J. Statman* and *Amanda M. Riggs* were on brief.

*David H. Coffman*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Cynthia*

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, were on brief.

*Margaret A. McGoldrick* was on brief for the intervenor. *Cynthia S. Bogorad* entered an appearance.

Before: GINSBURG, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Ameren Services Company (Ameren) challenges the Federal Energy Regulatory Commission's (FERC or Commission) interpretation of a settlement agreement entered into in 1997 between Ameren and Intervenor Rolla Municipal Utilities (Rolla). On August 24, 2001, Ameren filed with FERC an unexecuted Network Integration Transmission Service Agreement (SA) governing its unbundled transmission service to Rolla. The Commission accepted the unexecuted SA for filing but—relying on the aforementioned settlement agreement—rejected Ameren's calculation of the "distribution charge" to be paid by Rolla for Rolla's use of certain facilities owned and operated by Ameren's public utility affiliates. *Ameren Servs. Co.*, 97 F.E.R.C. ¶ 61,067 (2001) (*Order Accepting SA*). Ameren filed a request for rehearing, which the Commission denied, relying once again on the language of the settlement agreement. *Ameren Servs. Co.*, 97 F.E.R.C. ¶ 61,343 (2001) (*Order Denying Rehearing*).

On review, Ameren argues that the Commission erred in finding that the settlement agreement between Ameren and Rolla unambiguously prohibits Ameren from adjusting Rolla's distribution charge in order to take into account costs that Ameren incurred before the effective date of their agreement. Ameren further argues that the Commission improperly ignored extrinsic evidence and, in addition, impermissibly changed its rationale. We disagree and, accordingly, deny the petition for review.

**I.**

Ameren acts as the transmission provider and agent for two public utility affiliates: Central Illinois Public Service

Company and Union Electric Company. On October 15, 1997, the Commission approved a settlement agreement between Union Electric Company and certain of its municipal customers—including Rolla—to effectuate the transition of those customers from "bundled" to "unbundled" transmission service.[1] *Union Elec. Co.*, 81 F.E.R.C. ¶ 61,011 (1997). Pursuant to that agreement, Ameren filed with the Commission on October 26, 1999 a document entitled "Principles Governing Charges and Loss Factors for Wholesale Direct Assignment Facilities" (Principles Document). The Principles Document memorialized the agreement among the parties on the methodology for calculating each municipal customer's "distribution charge"—*i.e.*, the charge for using the Wholesale Direct Assignment Facilities owned and operated by Ameren's public utility affiliates. *See* Principles Document §§ A.1–A.4. A customer's distribution charge takes effect once the customer begins to receive unbundled transmission service from Ameren.

Section A.1 of the Principles Document provides that a municipal customer's distribution charge "shall be calculated by applying an annual carrying charge of 16.42% to the original installed cost of Wholesale Direct Assignment Facilities applicable to such customer . . . as shown on the list attached to this Agreement as Attachment A." *Id.* § A.1. It further states that "[t]he resultant charges for Wholesale Direct Assignment Facilities (absent adjustment as provided for below) are also set forth in Attachment A." *Id.* Attachment A lists Rolla's preliminary annual distribution charge as $309,374 and its adjusted annual distribution charge as $288,811.[2] *Id.* at Attachment A.

---

[1] *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 682–83 (D.C. Cir. 2000) (per curiam) (discussing FERC's orders mandating so-called "functional unbundling," *i.e.,* the separation of a utility's "wholesale transmission functions" from its "wholesale electricity merchant functions"), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[2] Rolla's adjusted annual distribution charge "reflect[s] the purchase, by Rolla, of certain distribution facilities serving Rolla."

The distribution charge "adjustment[s]" referred to in Section A.1 are explained in the three subsequent provisions, only one of which (Section A.2) is relevant here.[3] Allowing for the adjustment of a customer's distribution charge in certain limited circumstances, Section A.2 provides, in pertinent part, as follows:

> If the Transmission Provider [Ameren] makes significant modifications to Wholesale Direct Assignment Facilities . . . or if there is a change in ownership or reclassification of Wholesale Direct Assignment Facilities, then the 16.42% annual carrying charge would be applied to the original installed cost adjusted to take account of the change in the Wholesale Direct Assignment Facilities.

Principles Document § A.2 (footnote omitted). Section A.2 also prohibits an adjustment for specific types of facility modifications, namely: (1) any adjustment "to take account of changes in the Wholesale Direct Assignment Facilities that would properly be recorded as an operating and maintenance charge under the Uniform System of Accounts" and (2) any adjustment that would change the distribution charge by less than the "deadband" of $1,000 per month. *Id.* Lastly, Section A.2 requires Ameren to consult with affected customers before proceeding with "significant" facility modifications—*i.e.*, those exceeding the deadband. *Id.*

---

Principles Document, Attachment A n.3. At oral argument, counsel explained that Rolla purchased the aforementioned distribution facilities from Ameren before the effective date of their agreement. The purchase reduced the "original installed cost" of Ameren's Wholesale Direct Assignment Facilities and, as a result, similarly reduced Rolla's annual distribution charge.

[3] Section A.3 allows for an adjustment to the distribution charge "in the event [Ameren] recovers all or part of the costs associated with the Wholesale Direct Assignment Facilities under other contractual arrangement[s] with the Transmission Customer (or its retail customers)." Principles Document § A.3. Section A.4 addresses the allocation of—and adjustments to—the "original cost" of "jointly-used" Wholesale Direct Assignment Facilities. *Id.* § A.4.

On January 1, 2001, Rolla began taking unbundled transmission service from Ameren's public utility affiliates. Shortly thereafter, on January 31, 2001, Ameren filed an unexecuted SA with the Commission governing Rolla's transmission service, requesting an effective date of January 1, 2001. After resolving some of the disputed issues with Rolla, Ameren filed a revised, unexecuted SA with the Commission on August 24, 2001. The unexecuted SA included an annual distribution charge of $446,664 rather than the adjusted annual distribution charge of $288,811 set forth in Attachment A. Ameren calculated a higher distribution charge because its measure of the Wholesale Direct Assignment Facilities serving Rolla—unlike the measure in Attachment A—included the additional costs of (1) upgrading Ameren's Phelps substation in mid–1997 and (2) modifying that substation's control panel in December 2000. As a result of the increased charge, Rolla filed a protest with the Commission on September 14, 2001, challenging Ameren's calculation of its distribution charge.

The Commission issued its initial order on October 23, 2001, accepting the unexecuted SA for filing, but rejecting, *inter alia*, Ameren's calculation of Rolla's distribution charge. *Order Accepting SA*, 97 F.E.R.C. at 61,360. Although Ameren maintained that the charges set forth in Attachment A were "merely illustrative," the Commission concluded that the plain language of the Principles Document indicated otherwise: " '[t]he resultant charges for Wholesale Direct Assignment Facilities [are] set forth in Attachment A.' " *Id*. (quoting Principles Document § A.1). The Commission further concluded that, "even assuming that the Attachment A costs were illustrative only," the Principles Document "precluded [Ameren] from collecting its proposed charge by operation of the four-year moratorium agreed to by the parties."[4] *Id*.

---

[4] Section C of the Principles Document provides, in pertinent part, that "[t]he above specified principles shall govern determination of Wholesale Direct Assignment Facilities Charges . . . for no less than four years from the date of filing ('Moratorium Period'), after which time the methodology and procedures for determining Wholesale Direct Assignment Facilities Charges . . . may be changed . . . ." Principles Document § C.

Accordingly, the Commission ordered Ameren to revise the unexecuted SA to provide for an annual distribution charge of $288,811. *See id.*

On December 21, 2001, the Commission denied Ameren's request for rehearing. *Order Denying Rehearing*, 97 F.E.R.C. at 62,597. In that order, the Commission specifically rejected Ameren's assertion that Section A.2 of the Principles Document "entitle[d] Ameren to recover pre-settlement costs ... that were known to exist at the time [of its agreement with Rolla]" but not included in the agreement itself. *Id.* The Commission interpreted Section A.2 to permit adjustments to the distribution charge only "(1) where Ameren 'makes significant modifications to Wholesale Direct Assignment Facilities[ ]' or (2) 'if there is a change of ownership or reclassification of Wholesale Direct Assignment Facilities.'" *Id.* (quoting Principles Document § A.2). Relying on the words "makes" and "change," the Commission reasoned that "[b]oth conditions expressly contemplate actions or events occurring *after* the date of the settlement." *Id.* (emphasis in original). Because the modifications at issue were made before the filing of the Principles Document,[5] the Commission concluded that Section A.2 did not authorize Ameren to include the costs of the modifications in Rolla's distribution charge. *Id.* The Commission also rejected Ameren's interpretation of the moratorium provision and instead concluded that the Principles Document precluded Ameren from seeking an adjustment of Rolla's distribution charge not otherwise sanctioned by Section A.2. *Id.*

## II.

Ameren argues on review that the Commission erred in concluding that the Principles Document unambiguously pro-

---

[5] Although Ameren modified the Phelps substation's control panel in December 2000, that is, *after* the filing of the Principles Document, recovery of these costs would raise Rolla's distribution charge by only $5,974 annually. Thus, by itself, the control panel modification does not exceed the deadband. *See* Principles Document § A.2 (distribution charge adjustment must exceed deadband of $1000/month).

hibits Ameren from adjusting Rolla's distribution charge as set forth in the unexecuted SA. When read as a whole, Ameren maintains, the Principles Document demonstrates that the distribution charge for each customer is to be determined by applying the 16.42% annual carrying charge to the cost of the Wholesale Direct Assignment Facilities applicable to each customer at the time that customer commences unbundled service. Thus, under Ameren's reading of the Principles Document, the distribution charges set forth in Attachment A "merely . . . illustrate the charges that would result from application of the agreed upon settlement methodology." Br. for Pet'r at 27. Asserting that the Commission's orders turn on an erroneous finding that the plain language of the Principles Document prohibits the aforementioned interpretation, Ameren seeks a remand for further proceedings.[6]

In reviewing the Commission's interpretation of the Principles Document, we employ a variation of the now familiar "two-step" first performed by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Cajun Elec. Power Coop. v. FERC*, 924 F.2d 1132, 1135–36 (D.C. Cir. 1991) (*Chevron* deference applies to agency interpretation of agency-approved contract); *see also Appalachian Power Co. v. FERC*, 101 F.3d 1432, 1435 (D.C. Cir. 1996) (same). Applying *Chevron* in this context, we first consider *de novo* whether the settlement agreement unambiguously addresses the matter at issue. *Cajun*, 924 F.2d at 1136. If so, the language of the agreement controls for we "must give effect to the unambiguously expressed intent of" the parties. *Chevron*, 467 U.S. at 843; *see Cajun*, 924 F.2d at 1136. If the

---

[6] In the alternative, Ameren maintains that "the [c]ourt would be fully justified in reversing the Commission's decision for failure to satisfy the test of reasoned decision-making." Br. for Pet'r at 39. Ameren is mistaken. As we explain in the text, remand to the agency is the appropriate disposition "if an agency decision turns on an erroneous assertion that the plain language of [a settlement agreement] is unambiguous." *Cajun Elec. Power Coop. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991).

settlement agreement is ambiguous, however, we then examine the Commission's interpretation[7] of that agreement "under the deferential 'reasonable' standard." *Cajun*, 924 F.2d at 1136. If the Commission's decision "turns on an erroneous assertion that the plain language of the relevant wording is unambiguous," as Ameren alleges here, "we must remand" the matter to the Commission "to require the agency to consider the question afresh in light of the ambiguity we see." *Id.*

Thus, the only question before us is whether the Commission correctly concluded that the Principles Document unambiguously prohibits distribution charge adjustments based on costs Ameren incurred before October 26, 1999—the date Ameren filed the Principles Document. A contract is ambiguous if it is " 'reasonably susceptible of different constructions or interpretations,' " *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C. Cir. 1985) (quoting *Lee v. Flintkote Co.*, 593 F.2d 1275, 1282 (D.C. Cir. 1979)), not simply "because the parties later disagree on its meaning," *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir.), *cert. denied*, 516 U.S. 863 (1995). We determine the plain meaning of a contract "from the language used by the parties to express their agreement." *WMATA v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980). "In performing this task, [we] should construe the contract as a whole so as to give meaning to all of the [contract's] express terms." *Id.*

In the Commission's view, the plain language of the Principles Document unambiguously prohibits distribution charge

---

[7] The Commission may consider extrinsic evidence only if the settlement agreement is ambiguous. *Appalachian Power*, 101 F.3d at 1435 (citing *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1546 (D.C. Cir. 1985)). Because we conclude that the Commission correctly found that the Principles Document *unambiguously* prohibits Ameren from adjusting Rolla's distribution charge based on costs Ameren incurred before October 26, 1999, we need not consider Ameren's argument that the Commission improperly ignored extrinsic evidence in reaching its decision.

adjustments based on costs Ameren incurred before the October 26, 1999 filing date.[8] *See Order Denying Rehearing*, 97 F.E.R.C. at 62,597. As the Commission emphasizes on review, its interpretation relies primarily on Section A.2's combined use of the subjunctive voice and present tense. Principles Document § A.2 ("*If* the Transmission Provider *makes* significant modifications . . . or *if* there *is* a *change* in ownership or reclassification . . ., *then* the 16.42% annual carrying charge *would be applied* to the original installed cost adjusted to take account of the change in the Wholesale Direct Assignment Facilities.") (emphasis added). The Commission points out that the verb "make" means, *inter alia*, "bring[ing] about (a condition of things)" and that "such language contemplates that only future modifications, occurring after the filing date of the [Principles Document], will trigger adjustments in [the] distribution charge." Br. for Resp't at 13–14 (citing THE NEW SHORTER OXFORD DICTIONARY 1671 (1993)); *see Order Denying Rehearing*, 97 F.E.R.C. at 62,597 ("[T]he word 'makes,' as it appears in [Section A.2], does not implicate the modifications made to the Phelps substation in [1997], which could only be described by the addition of a past tense verb, *i.e.*, 'makes or made.' "). Similarly, asserting that the word "change" makes sense only "if at the time of filing there was a *status quo* that could be altered," the Commission likewise contends that "the 'change' referred to would have to occur *after* the filing date." Br. for Resp't at 14 (emphasis in original); *see Order Denying Rehearing*, 97 F.E.R.C. at 62,597 ("[T]he word 'change' can only have meaning by reference to the *status quo* as it existed at the time of the settlement."). Because Ameren's upgrade of the Phelps substation occurred in mid–1997, the Commission maintains that it correctly concluded that the Principles

---

[8] Ameren claims that the Commission's orders do not reflect reasoned decision-making because the *Order Denying Rehearing* "supplied a new rationale" for the agency's decision. Br. for Pet'r at 43. This argument is without merit. The very purpose of rehearing is to give the Commission the opportunity to review its decision before facing judicial scrutiny.

Document unambiguously prohibits Ameren's proposed adjustment of Rolla's distribution charge.

We agree with the Commission that Section A.2's language necessarily contemplates a baseline date from which to measure distribution charge adjustments. But what is the baseline date? The Commission argues, quite reasonably, that the effective date of the agreement—October 26, 1999—is the only possible baseline from which to measure the distribution charge adjustments authorized by Section A.2. Ameren, on the other hand, contends that the Principles Document may just as reasonably be construed as including distribution charge adjustments for any modifications made after the issuance of the 1992 Allocation Study, *i.e.*, the study used to derive the "original installed cost of Wholesale Direct Assignment Facilities" listed in Attachment A. We disagree with Ameren.

As an initial matter, Ameren's interpretation stands for a peculiar proposition—that the parties entered into an agreement that afforded "no certainty to [their] rights and obligations *even as to those facts and circumstances that were known to exist at that time*." *Order Denying Rehearing*, 97 F.E.R.C. at 62,597 (emphasis in original). However, if the parties had intended the distribution charges listed in Attachment A to be merely "illustrative," as Ameren contends, that intent should be clear within the four corners of the Principles Document. But Ameren can point to no language reflecting such intent. Indeed, as Rolla emphasizes on review, "[n]o form of the word 'illustrative' appears anywhere in the [Principles Document]." Br. for Intervenor at 5. To the contrary, the Principles Document expressly states that "[t]he *resultant* charges for Wholesale Direct Assignment Facilities (absent adjustment as provided for below) are . . . set forth in Attachment A." Principles Document § A.1 (emphasis added).[9]

---

[9] The phrase "absent adjustment as provided for below" plainly refers to the adjustments expressly allowed by Sections A.2, A.3 and A.4 of the Principles Document. *See* Principles Document §§ A.1–A.4; *supra* note 3 and accompanying text. Although the

More importantly, Ameren's reading of Section A.2 strains both the language and structure of the Principles Document. To begin with, pre-settlement modifications—including those made after the 1992 Allocation Study but before the October 26, 1999 filing date—are modifications that Ameren "has made" rather than those Ameren "makes" subsequent to the effective date of the agreement. *See* Principles Document § A.2. Section A.4 casts similar doubt on the reasonableness of Ameren's reading of Section A.2.[10] Addressing "jointly-used" Wholesale Direct Assignment Facilities, Section A.4 provides that the "original cost" of such facilities "shall be allocated using [Ameren's] 1992 Allocation Study . . . the results of which are reflected in Attachment A." Principles Document § A.4. In addition, Section A.4 expressly authorizes certain pre-settlement adjustments:

> This allocation of jointly-used facilities shall be changed only if a party can show that material

Commission omitted the phrase from its initial decision, *see Order Accepting SA*, 97 F.E.R.C. at 61,360, the *Order Denying Rehearing* explained that, under Section A.2, Ameren may adjust a customer's distribution charge in "two limited circumstances," *Order Denying Rehearing*, 97 F.E.R.C. at 62,597. Thus, contrary to Ameren's contention, the Commission did not interpret the Principles Document as precluding any and all adjustments from the distribution charges set forth in Attachment A.

[10] Ameren mistakenly claims that the Commission's reliance on Section A.4 constitutes an "impermissible *post hoc* rationalization" because the agency did not rely on this provision in either of the orders under review. Reply Br. at 3. Although "*post hoc* rationalizations cannot support an affirmance of an agency decision based on an otherwise invalid rationale," the Commission does not ask "us to substitute a *post hoc*, and therefore unacceptable, rationale for an otherwise invalid rationale rejected by the court on review." *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000). On the contrary, the Commission offers on review "a persuasive interpretation" of Section A.4 that is "consistent" with its overall reading of the Principles Document. *Id.* Accordingly, "[t]here is no difficulty in our reviewing the . . . language [of the Principles Document] *de novo*." *Id.* at 835–36.

> change occurred after 12/31/97 in the relative usage of such Wholesale Direct Assignment Facilities between and among retail and wholesale customers.

*Id.* The absence of a comparable provision in Section A.2 strongly suggests that the parties did not intend for pre-settlement events to trigger similar adjustments under Section A.2. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) ("the mention of one thing implies the exclusion of another thing") (internal quotations omitted). Indeed, the express incorporation of pre-settlement adjustments within Attachment A itself—including an adjustment to Rolla's distribution charge—further undermines Ameren's interpretation for it indicates that the parties were well aware of how to adjust distribution charges for changes occurring before October 26, 1999. *See supra* note 2.

We find Ameren's arguments to the contrary unpersuasive. To support its claim that the distribution charges listed in Attachment A are merely illustrative, Ameren relies chiefly upon the use of the word "methodology" in the cover letter that accompanied its October 26, 1999 filing.[11] Yet the cover letter's use of the word "methodology" is entirely consistent with Commission's interpretation of the Principles Document—*i.e.*, the Principles Document establishes a methodology for adjusting the distribution charges listed in Attachment A to take account of changes occurring after October 26, 1999. *See Order Denying Rehearing*, 97 F.E.R.C. at 62,597. Moreover, the cover letter lends no support to Ameren's claim that the 1992 Allocation Study serves as the baseline from which to measure distribution charge adjustments.

Ameren's reliance on the language of Section A.1 is similarly misplaced. As earlier noted, Section A.1 provides that each customer's distribution charge "shall be calculated by

---

[11] While we need not decide the question here, we are doubtful that the cover letter on which Ameren relies is even relevant to our inquiry into the Principles Document's plain meaning. *See Mid–Continent Area Power Pool*, 97 F.E.R.C. ¶ 61,038, 61,184 (2001) ("submittal" does not include "cover letter"), *remanded on other grounds*, 305 F.3d 780 (8th Cir. 2002).

applying an annual carrying charge of 16.42% to the original installed cost of Wholesale Direct Assignment Facilities applicable to such customer." Principles Document § A.1. Reading the phrase "shall be calculated" in a predictive sense, Ameren argues that the Principles Document simply establishes the methodology for calculating a customer's distribution charge once that customer begins to receive unbundled transmission service.[12] Ameren's interpretation ignores, however, the phrase that immediately follows: "as shown on the list attached to this Agreement as Attachment A." *Id.* Further, Ameren's argument suffers from a more critical error of omission: it fails to account for the final—and crucial—sentence of Section A.1: "The *resultant charges* for Wholesale Direct Assignment Facilities (absent adjustment as provided for below) are also set forth in Attachment A." *Id.* (emphasis added).[13]

## III.

For the foregoing reasons, we conclude that the Principles Document unambiguously prohibits Ameren from adjusting Rolla's distribution charge in order to take into account costs that it incurred before October 26, 1999. Ameren's petition for review is therefore denied.

*So ordered.*

---

[12] We find Ameren's "predictive" reading of the phrase "shall be calculated" somewhat strained. As Rolla observes on review, "[t]he word 'shall,' when utilized in laws, directives, and the like, means 'must' or 'is or are obligated to.'" *Bell Atl.-New Jersey v. Tate*, 962 F. Supp. 608, 616 n.6 (D.N.J. 1997) (quoting RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1230 (1991)). Here, the phrase "shall be calculated" simply reflects Ameren's obligation to calculate each customer's distribution charge using the agreed upon methodology.

[13] Because we agree with the Commission's conclusion that Sections A.1 and A.2 prohibit Ameren from increasing Rolla's distribution charge for modifications made before October 26, 1999, we need not address Ameren's challenge to the Commission's interpretation of the moratorium provision in Section C.