# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 12, 2006          Decided December 5, 2006

No. 05-1241

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
LOCAL 2924,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of an Order of the
Federal Labor Relations Authority

*Judith D. Galat* argued the cause for petitioner. With her on the briefs were *Mark D. Roth* and *Charles A. Hobbie. Anne M. Wagner* entered an appearance.

*William E. Persina*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief was *William R. Tobey*, Deputy Solicitor. *David M. Smith*, Solicitor, entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The American Federation of Government Employees, Local 2924 ("Union") petitions for review of a Federal Labor Relations Authority ("Authority") decision and order dismissing an unfair labor practice ("ulp") complaint filed pursuant to the Federal Service Labor-Management Relations Statute ("Statute"), 5 U.S.C. §§ 7101-7135. In its charge to the Authority, the Union alleged that the Aerospace Maintenance and Regeneration Center at Davis-Monthan Air Force Base ("Davis-Monthan AFB" or "employer") violated § 7116(a)(1) and (5) of the Statute by repudiating certain provisions of the parties' collective bargaining agreements dealing with employee drug testing and rehabilitation. An Administrative Law Judge ("ALJ") agreed that Davis-Monthan AFB repudiated the agreements by terminating employees who were actively engaged in rehabilitation. The employer filed exceptions to the ALJ's decision and the Authority reversed. *U.S. Dep't of the Air Force, Aerospace Maint. & Regeneration Ctr., Davis-Monthan Air Force Base, Tucson, Ariz.*, 60 F.L.R.A. No. 166 (May 12, 2005) ("*Davis-Monthan AFB*"), *reprinted in* Joint Appendix ("J.A.") 10-78.

When a federal agency commits "a clear and patent breach" of a collective bargaining agreement, this will be deemed an unlawful "repudiation" of the contract if it "go[es] to the heart of the parties' agreement." *Dep't of the Air Force, 375th Mission Support Squadron, Scott Air Force Base, Ill.* (*Scott AFB*), 51 F.L.R.A. 858, 861-63 (1996). In this case, the Authority held that the employer's actions did not constitute a clear and patent breach of the parties' agreements. In reaching this conclusion, the Authority relied primarily on the testimony of employer witnesses who were at the bargaining table when the contract language was negotiated. The Authority found that, although the employer's interpretation of the agreements was not irrefutable, it was reasonable and fully consistent with the testimony of the employer's witnesses. *Davis-Monthan AFB*, 60

F.L.R.A. No. 166, slip op. at 19-20. The Authority therefore dismissed the complaint, relying on its *Scott AFB* rule that, "[i]n those situations where the meaning of a particular agreement term is unclear, acting in accordance with a reasonable interpretation of that term, even if it is not the only reasonable interpretation, does not constitute a clear and patent breach of the terms of the agreement." *Id*. at 14 (quoting *Scott AFB*, 51 F.L.R.A. at 862).

The Union now seeks review, contending that the Authority's decision in this case must be reversed, because it fails to follow well-established principles of contractual interpretation. According to the Union, "[i]t is axiomatic that courts must first look to the plain language of a contract provision before considering extrinsic evidence as to meaning." Petitioner's Br. at 15. We agree. The Authority's interpretation of the parties' agreements in this case cannot be squared with the plain language of those agreements. The agreements are indisputably clear in establishing a temporary safe harbor for employees who are properly engaged in rehabilitation and not otherwise unsuitable for employment. The Authority erred in considering extrinsic evidence – self-serving testimony from employer witnesses – which purports to refute the plain terms of the agreements. Where, as here, the language of a collective bargaining agreement can bear only one reasonable interpretation, the Authority may not "create" an ambiguity by crediting extrinsic evidence offered by a party who is seeking to nullify the plain terms of the contract.

We hold that the Authority's finding that Davis-Monthan AFB did not clearly and patently breach the agreements is both arbitrary and capricious and unsupported by substantial evidence. We therefore grant the petition for review, vacate the Authority's order, and remand the case to the Authority to allow it to apply the second prong of its repudiation test.

4

## I. BACKGROUND

### A. *Statutory Context*

The Federal Service Labor-Management Relations Statute makes it an unfair labor practice for a federal employer "to interfere with, restrain, or coerce any employee" attempting to exercise his or her rights under the Statute, or "to refuse to consult or negotiate in good faith with a labor organization as required by [the Statute]." 5 U.S.C. § 7116(a)(1), (5). Not every breach of contract is an unfair labor practice, however. *Dep't of Def., Warner Robins Air Logistics Ctr., Robins Air Force Base, Ga.*, 40 F.L.R.A. 1211, 1218 (1991). If an employer commits "a clear and patent breach" of a collective bargaining contract that "go[es] to the heart of the parties' agreement," the breach is considered to be an unlawful "repudiation" of the contract under the Statute. *Scott AFB*, 51 F.L.R.A. at 861-63; *see also Cornelius v. Nutt*, 472 U.S. 648, 664-65 (1985) ("[I]f the violation constitutes 'a clear and patent breach of the terms of the agreement,' the union may file an unfair labor practice charge . . . ." (quoting *Iowa Nat'l Guard & Nat'l Guard Bureau*, 8 F.L.R.A. 500, 510 (1982))). If "the meaning of a particular agreement term is unclear," and an employer acts pursuant to a "reasonable interpretation of that term," the employer's action "does not constitute a clear and patent breach of the terms of the agreement." *Scott AFB*, 51 F.L.R.A. at 862.

### B. *Factual Background*

In 1986, President Reagan issued an Executive Order entitled "Drug-Free Federal Workplace," directing agencies to develop drug testing plans "designed to offer drug users a helping hand and, at the same time, demonstrat[e] . . . that drugs will not be tolerated in the Federal workplace." Exec. Order No. 12,564, 51 Fed. Reg. 32,889 (Sept. 17, 1986). In 1991, the Union and Davis-Monthan AFB executed an agreement

designed to augment the Air Force's plan. Air Force Civilian Drug Testing Agreement Between Davis-Monthan Air Force Base and AFGE Local 2924 ("Local Drug Agreement"), *reprinted in* J.A. 150-60. Section 9 of the Local Drug Agreement provides:

> Employees whose tests have been verified positive will be notified in writing to report to Social Actions for evaluation and appropriate referral for counseling and/or rehabilitation. Employees will be informed of the consequences should they refuse counseling or rehabilitation.
>
> a. The Employer will retain employees in a duty or approved leave status while undergoing rehabilitation.

J.A. 154. Section 12 provides: "If the report is positive and employee does not wish to challenge its findings, the Employer will make reasonable accommodations for the employee's drug problem by providing him/her access to a drug treatment and rehabilitation program." J.A. 155.

In 1998, the Union and Davis-Monthan AFB entered into a collective bargaining agreement. Labor Management Relations Agreement Between Davis-Monthan AFB, Arizona and Local 2924 American Federation of Government Employees ("CBA"), *reprinted in* J.A. 99-149. Article 27 of the CBA reads:

> Section 1. For the purpose of this Article, alcoholism and drug abuse are defined as illnesses in which the employee's job performance is impaired as a direct consequence of the abuse of alcohol or drugs.
>
> Section 2. The Union and the Employer jointly recognize alcoholism and drug abuse as treatable illnesses; therefore, employees having these illnesses will receive the same careful consideration and offer of assistance that is extended to employees having any

other illness or health problem. Employees participating in drug or alcohol abuse rehabilitation programs may request sick, annual, or leave without pay the same as they would for medical purposes. . . . Failure to successfully complete a rehabilitation program which results in acceptable work performance, after a reasonable period of time, will result in disciplinary procedures.

Section 3. The ultimate objective of the drug and alcohol abuse program will be to rehabilitate the employee through counseling, referral for medical assistance, and other such means as may be available to aid in the recovery of the employee. Referral for diagnosis and acceptance of treatment should in no way jeopardize an employee's job security or promotional opportunities.

J.A. 134.

Beginning in 2001, several employees at Davis-Monthan AFB faced dismissal for drug abuse, even while undergoing rehabilitation. For example, in September 2001, Dana Clark, a civilian Motor Vehicle Operator working at Davis-Monthan AFB, tested positive for marijuana during a random drug test. That November, Davis-Monthan AFB issued a notice proposing to terminate Clark, allowing him time to respond to the allegation of drug use. Clark informed his employer that he had immediately and voluntarily enrolled in a rehabilitation program. The employer nonetheless terminated Clark that December, while he was still in rehabilitation.

These incidents caused Union officials to question management's commitment to the drug testing and rehabilitation program. In November 2001, Union officials met with Colonel Hendricks, the employer's third-step grievance officer, to protest the termination of employees for drug abuse. *See* J.A. 322-24.

Jean Southam, a national Union representative at Davis-Monthan AFB, testified that, when asked why an employee would be fired while in rehabilitation, Colonel Hendricks said, "My policy is zero tolerance." J.A. 323. When he was reminded that the parties' collective bargaining agreements afforded protection to employees, Colonel Hendricks reportedly said, "I don't care about your contract." J.A. 323.

## C. *Proceedings Below*

The Union filed a charge with the Authority, claiming that Davis-Monthan AFB repudiated Article 27 of the CBA by removing employees while they were properly enrolled in rehabilitation programs. Based on this charge, General Counsel for the Authority issued a complaint alleging that Davis-Monthan AFB had committed an ulp in violation of § 7116(a)(1) and (5), by repudiating §§ 9 and 12 of the Local Drug Agreement and Article 27 of the CBA. An ALJ reviewed the two agreements and heard testimony, including descriptions of bargaining history given by two Davis-Monthan AFB managers who participated in negotiations on behalf of the employer. These two managers testified that the parties intended only to require that supervisors grant employees leave to participate in rehabilitation during working hours, not to limit management's range of disciplinary options. In other words, notwithstanding the clear language in § 9 – "[t]he Employer will retain employees in a duty or approved leave status while undergoing rehabilitation" – and Article 27 – "[r]eferral for diagnosis and acceptance of treatment should in no way jeopardize an employee's job security or promotional opportunities" – these employer witnesses claimed that employees could be fired while in rehabilitation even if otherwise suitable to be retained in duty or leave status.

The ALJ issued a decision on September 26, 2003, finding that "[r]ehabilitation is a key consideration in the Executive Order, the [Air Force's plan], the Local Drug Agreement and

[the CBA]." *Davis-Monthan AFB*, 60 F.L.R.A. No. 166, slip op. at 24. He found the testimony on bargaining history irrelevant in light of § 9 of the Local Drug Agreement, which he found to be "clear and wholly unambiguous." *Id.* at 25-26. The ALJ construed § 9 to mean that "[c]learly, if in rehabilitation, the Employer shall not remove, or attempt to remove, the employee." *Id.* at 27. The ALJ concluded that Davis-Monthan AFB repudiated both the Local Drug Agreement and the CBA through "clear and intentional" violations of §§ 9 and 12 of the former and Article 27 of the latter. *Id.* at 30-31.

Davis-Monthan AFB filed exceptions with the Authority seeking review of the ALJ's decision. On review, the Authority found "no evidence in the record that [Davis-Monthan AFB] failed to provide the employees access to a drug treatment and rehabilitation program" in violation of § 12 of the Local Drug Agreement. *Id.* at 20. The Authority also held that Davis-Monthan AFB did not repudiate the parties' agreements, because § 9 and Article 27 are not "clear and wholly unambiguous," but, rather, are "subject to more than one interpretation." *Id.* at 15. The Authority found the ALJ's interpretation of § 9 reasonable, but concluded that Davis-Monthan AFB's interpretation – that the provision is "silent with regard to discipline and concerns only the leave status of employees who attend rehabilitation during duty hours," *id.* at 18 – is also "fully consistent with the testimony of the only witnesses who participated in the negotiations," *id.* at 16. After deciding "that [Davis-Monthan AFB] acted under a reasonable interpretation of § 9(a) and Article 27 and, as such, did not commit a clear and patent breach of those provisions," *id.* at 15, the Authority dismissed the complaint. Member Pope filed a strong dissent, claiming that Davis-Monthan AFB's "interpretation is far off the mark" and "unbelievable, in every sense of the word." *Id.* at 28-29. She added, "Bargaining history testimony asserting an unreasonable interpretation does not make the interpretation any more reasonable." *Id.* at 29 n.1.

The Union now petitions for review of the Authority's order, claiming that the Authority acted arbitrarily and capriciously by dismissing the complaint based on bargaining history testimony that directly contradicts the plain language of the parties' agreements.

## II. ANALYSIS

### A. *Standard of Review*

We will set aside an order of the Authority if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *see* 5 U.S.C. § 7123(c) ("Review of the Authority's order shall be on the record in accordance with section 706 of this title."). In order to determine whether the Authority acted arbitrarily and capriciously, "we look to whether the Authority has offered a rational explanation for its decision [and] whether its decision is based on consideration of the relevant factors . . . ." *Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA* (*NAGE, Local R5-136*), 363 F.3d 468, 474 (D.C. Cir. 2004) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "We will uphold the Authority's decision 'if, but only if, we can discern a reasoned path from the facts and considerations before the [agency] to the decision it reached.'" *Nat'l Treasury Employees Union v. FLRA* (*NTEU*), 466 F.3d 1079, 1081 (D.C. Cir. 2006) (quoting *U.S. Info. Agency v. FLRA*, 960 F.2d 165, 169 (D.C. Cir. 1992)). To be upheld, the decision "must come with '[such] relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Am. Fed'n of State, County & Mun. Employees Capital Area Council 26 v. FLRA*, 395 F.3d 443, 447 (D.C. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Certainly, if the result reached is "illogical on its own terms," the Authority's order is arbitrary and capricious. *IRS v. FLRA*, 963 F.2d 429, 439 (D.C. Cir. 1992).

**B.  *The Issues on Review***

The Authority's determination that the employer did not "fail[] to provide the employees access to a drug treatment and rehabilitation program" as required by § 12 of the Local Drug Agreement is supported by substantial evidence and it is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  We therefore deny the petition for review insofar as it challenges this decision.

Davis-Monthan AFB argued before the Authority that "the [disputed contract] provisions as [interpreted by the ALJ] are unenforceable because they are contrary to management's right to discipline under [the Statute]."  *Davis-Monthan AFB*, 60 F.L.R.A. No. 166, slip op. at 10.  The Authority did not address this contention below, and it has not raised the argument in its briefs to this court.  Therefore, this question is not before the court on review.  The principal issue here is whether the Authority erred in its construction of § 9 of the Local Drug Agreement and Article 27 of the CBA.

**C.  *The Meaning of the Parties' Agreements***

Interpretation of a contract, like statutory and treaty interpretation, must begin with the plain meaning of the language.  *See, e.g.*, *NAGE, Local R5-136*, 363 F.3d at 476 (examining the "express language" of a collective bargaining agreement); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("[I]n any case of statutory construction, our analysis begins with the language of the statute.  And where the statutory language provides a clear answer, it ends there as well.") (internal citation and quotation marks omitted); *Iceland S.S. Co.-Eimskip v. U.S. Dep't of Army*, 201 F.3d 451, 458 (D.C. Cir. 2000) ("When interpreting a treaty . . . we . . . 'must, of course, begin with the language of the Treaty itself.'" (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180

(1982))). In analyzing the alleged ulp in this case, the Authority seemed not to comprehend the principle of "plain meaning."

The Authority first noted that "it is not always necessary to determine the precise meaning of [a contract] provision in order to analyze an allegation of repudiation." *Davis-Monthan AFB*, 60 F.L.R.A. No. 166, slip op. at 13-14 (citing *Scott AFB*, 51 F.L.R.A. at 862 n.4). This proposition is drawn from *Scott AFB*, where the FLRA held that, "[i]n those situations where the meaning of a particular agreement term is unclear, acting in accordance with a reasonable interpretation of that term, even if it is not the only reasonable interpretation, does not constitute a clear and patent breach of the terms of the agreement." 51 F.L.R.A. at 862-63. This principle has no bearing on this case, however, because it applies only in situations when "the meaning of a particular agreement term is unclear." The disputed contract language in this case – "[t]he Employer will retain employees in a duty or approved leave status while undergoing rehabilitation" and "treatment should in no way jeopardize an employee's job security" – is not unclear. In concluding otherwise, the Authority followed an analytical path which suggests that, in determining whether the breach of a collective bargaining agreement is "clear and patent," it need not determine whether the agreement has a plain meaning. Needless to say, this course of analysis is completely misguided and far afield from the dictates of *Scott AFB*.

Our review of the Local Drug Agreement and CBA reveals mutually reinforcing terms establishing two general principles applicable to employee drug use and addiction. First, Article 27, § 2 defines drug abuse as an illness: "The Union and the Employer jointly recognize alcoholism and drug abuse as treatable illnesses; therefore, employees having these illnesses will receive the same careful consideration and offer of assistance that is extended to employees having any other illness or health problem." Second, both agreements guarantee

employees help enrolling in rehabilitation and treatment programs. Article 27, § 3 provides: "The ultimate objective of the drug and alcohol abuse program will be to rehabilitate the employee through counseling, referral for medical assistance, and other such means as may be available to aid in the recovery of the employee." Section 9 states that employees who test positive will be referred "to Social Actions for evaluation and appropriate referral for counseling and/or rehabilitation." And § 12 provides: "[T]he Employer will make reasonable accommodations for the employee's drug problem by providing him/her access to a drug treatment and rehabilitation program."

In service of these principles, the agreements establish a safe harbor for employees, guaranteeing that the employer will not dismiss any employee during the course of rehabilitation. Section 9(a) provides that "[t]he Employer will retain employees in a duty or approved leave status while undergoing rehabilitation," and Article 27 reads, "Referral for diagnosis and acceptance of treatment should in no way jeopardize an employee's job security or promotional opportunities." These provisions unambiguously create a limited window – the time period between when Davis-Monthan AFB learns of an employee's drug use and when the employee completes a rehabilitation program – during which an employee cannot be dismissed absent other cause. If an employee drops out of rehabilitation, he immediately forfeits the protection of § 9 and Article 27.

Not all employees who suffer from drug abuse gain the protection of the safe harbor. First, § 9 clarifies that the agreements do not protect employees who refuse rehabilitation: "Employees will be informed of the consequences should they refuse counseling or rehabilitation." Article 27 likewise states: "Failure to successfully complete a rehabilitation program which results in acceptable work performance, after a reasonable period of time, will result in disciplinary procedures." Second,

the agreements do not shelter employees who, apart from their drug problem, are insubordinate, have unacceptable work performance, or otherwise engage in misconduct warranting dismissal. And, finally, the agreements in no way restrict the employer's right to take appropriate action short of removal, such as reassignment of an employee to a less sensitive position.

At oral argument, in a vain attempt to refute the plain meaning of § 9 and Article 27, counsel for the Authority argued that if the parties had meant to establish a safe harbor they would have agreed to different contractual language. According to counsel, the following language would have been a model of clarity:

> [T]he agency employer cannot terminate an employee for illegal drug use until rehabilitation is concluded.

*See* Recording of Oral Argument at 15:31. This language mirrors what the parties' agreements say. Section 9 provides:

> The Employer will retain employees in a duty or approved leave status while undergoing rehabilitation.

And Article 27, § 3 states:

> The ultimate objective of the drug and alcohol abuse program will be to rehabilitate the employee through counseling, referral for medical assistance, and other such means as may be available to aid in the recovery of the employee. Referral for diagnosis and acceptance of treatment should in no way jeopardize an employee's job security or promotional opportunities.

The language suggested by the Authority's counsel says, "the employer cannot terminate." The parties' agreement says, "[t]he Employer will retain employees," *and* "[r]eferral for diagnosis and acceptance of treatment should in no way jeopardize an employee's job security or promotional opportunities." If the employer must "retain employees" and rehabilitation can "in no

way jeopardize an employee's job security," then an employee who is in rehabilitation obviously is protected from termination. No doubt, the parties could have been even clearer in expressing their intention if they had added, "and we really mean what we say." But even without such a declaration, the agreements are unambiguously plain in their meaning. Therefore, the Authority was obliged to construe the parties' contracts as written.

In an attempt to avoid the plain meaning of the agreements, the Authority started its analysis by focusing on the testimony offered by the employer regarding the parties' bargaining history. In so doing, the Authority conjured up an ambiguity in unambiguous language by crediting self-serving parol evidence that purported to refute what the contract said. The Authority's analysis was completely backwards and totally inconsistent with the dictates of *Scott AFB* and other relevant precedent.

An agreement is only "ambiguous if it[s language] is reasonably susceptible of different constructions or interpretations, not simply because the parties later disagree on its meaning." *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 499 (D.C. Cir. 2003) (internal citation and quotation marks omitted). Resort to parol evidence may only be had where the language of an agreement is ambiguous on its face. *NTEU*, 466 F.3d at 1081 ("[W]here the terms of a bargaining agreement are ambiguous, we look to evidence of the parties' contemporaneous understanding."); *Wash. Metro. Area Transit Auth. v. Georgetown Univ.*, 347 F.3d 941, 946 (D.C. Cir. 2003) ("If the . . . language is unambiguous, the court need only apply the meaning of the words. If the language is ambiguous, the court must determine the parties' intent . . . in light of the circumstances surrounding [the agreement's] execution."); *Ameren*, 330 F.3d at 498 ("[W]e first consider *de novo* whether the . . . agreement unambiguously addresses the matter at issue. If so, the language of the agreement controls for we must give effect to the unambiguously expressed intent of the parties.")

(internal citation and quotation marks omitted). In short, where the language of an agreement can bear only one interpretation, contradictory extrinsic evidence must be ignored. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004) ("[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded." (quoting *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89-90 (1823))); *Ameren*, 330 F.3d at 498 n.7 ("The [agency] may consider extrinsic evidence only if the . . . agreement is ambiguous."). The Authority plainly erred in considering parol evidence that directly contradicts the unambiguous meaning of the contractual terms.

The agreements admit of no ambiguity. Section 9 and Article 27 create a safe harbor that protects a narrow class of employees for a limited period of time so that they may focus on treatment and rehabilitation. The Authority's decision defies precedent and commonsense, and it reaches a conclusion that is "so implausible that it [cannot] be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Because the Authority's decision epitomizes arbitrary and capricious action, we grant the petition for review.

### III. CONCLUSION

Since the "Authority's decision to dismiss the . . . complaint is premised on an entirely untenable interpretation of the parties' [agreements]," we set "aside the Authority's dismissal of the . . . complaint as arbitrary and capricious." *NAGE, Local R5-136*, 363 F.3d at 471, 475. However, two elements must be analyzed in repudiation cases: "(1) the nature and scope of the alleged breach . . . (*i.e.*, was the breach clear and patent?); and (2) the nature of the agreement provision allegedly breached (*i.e.*, did the provision go to the heart of the parties' agreement?)." *Scott AFB*, 51 F.L.R.A. at 862. The Authority failed to ask the second question, because it erroneously concluded that the employer did not clearly and patently breach the agreements. We therefore

remand the case to the Authority and instruct it to give effect to the plain meaning of the agreements and apply the second prong of its repudiation test in order to determine whether Davis-Monthan AFB committed an unfair labor practice.