# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 16, 2009          Decided February 26, 2010

No. 08-1195

IBERDROLA RENEWABLES, INCORPORATED,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALLIANCE PIPELINE L.P. AND INTERSTATE NATURAL GAS
ASSOCIATION OF AMERICA,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Energy Regulatory Commission

———

*Mark K. Lewis* argued the cause and filed the briefs for petitioner.

*Judith A. Albert*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Virginia A. Seitz* argued the cause for intervenors. With her on the brief were *Joan Dreskin*, *Dan Regan*, *Timm Abendroth,* and *William A. Williams.*

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Although set against the complicated regulatory framework of federal energy law, at the end of the day, this petition for review of Federal Energy Regulatory Commission (FERC) orders requires only our straightforward application of the plain terms of a written contract. The question is whether FERC arbitrarily or capriciously read a contract to allow a pipeline to change its rates without first obtaining FERC's approval. Because the contract expressly excludes such a role for FERC, we deny the petition.

**I.**

Intervenor Alliance Pipeline L.P. operates an 887-mile pipeline that transports natural gas from the North Dakota-Canada border to the Chicago area. *Alliance Pipeline L.P.*, *Preliminary Determination on Non-Environmental Issues*, 80 FERC ¶ 61,149, at 61,590 (1997) [hereinafter *Preliminary Determination*]. Before Alliance began service on the pipeline, each shipper chose to negotiate the rate it would pay and committed that agreement to a written contract. Any shipper could have chosen a different option, a non-negotiable "recourse rate," based only on the pipeline's cost of providing service and a FERC-determined profit margin.

That the shipper in this case, predecessor in interest to Petitioner, Iberdrola Renewables, Inc., selected a negotiated rate is a critical fact that has bearing upon the central issue of this petition: whether FERC must approve changes Alliance made to the negotiated rate. In the exercise of its duty under section 4 of the Natural Gas Act (NGA) to ensure that rates are "just and reasonable," 15 U.S.C. § 717c(a) (2006), the Commission automatically reviews proposed changes to recourse rates but reviews changes to negotiated rates only when the contract requires it.[1] *See Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines*, 74 FERC ¶ 61,076, at 61,241 (1996) [hereinafter *Policy Statement*]. This approach reflects FERC's assumption that sophisticated parties will bargain for rates that are just and reasonable. *See id.* at 61,241–42. So long as the pipeline adjusts the negotiated rate consistently with the terms of the written agreement, FERC will accept the rate change without reviewing the adjustment for reasonableness. *See id.* at 61,238, 61,240. Shippers choosing negotiated rates thus can agree to avoid FERC's review under section 4 and thereby "remove themselves from any protection the Commission may give customers under recourse rates." *Colo. Gulf Transmission Co.*, 78 FERC ¶ 61,263, at 62,124 (1997). In effect, the shippers can bargain away the protection of FERC's prior approval of rate changes in exchange for what they see as more favorable rates.

---

[1] The briefing in this case and FERC's orders below suggest that negotiated rate customers and pipelines could provide in their contracts for FERC review of negotiated rate changes. For purposes of this case, we assume but do not decide that is so. If negotiated rate customers like Iberdrola cannot contract for section 4 review, the resolution of this case would be even more straightforward than it is because neither party disputes that Alliance and the shippers agreed to a negotiated rate.

Of course, negotiated rate customers are not left without redress if they think the rate has become unjust over time. They can always challenge an established rate under section 5 of the NGA on the ground that the rate is "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a). A section 5 review differs from a section 4 review in two significant ways. First, section 5 provides for FERC review of a rate only after it has taken effect. By contrast, FERC may only review a rate under section 4 at the time it is filed. *See Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 183–84 (D.C. Cir. 1986) (discussing the salient differences between NGA section 4 and section 5). Second, the pipeline bears the burden to show the proposed rate is reasonable in a section 4 action, whereas the shipper bears the burden to show an established rate is not in a section 5 case. Thus, shippers seeking to involve FERC in the review of their rates have three options: ex ante, they can (1) elect a recourse rate, which FERC will automatically review at the time it is filed, or (2) negotiate for FERC approval of rate changes in their contract; ex post, they can (3) pursue a section 5 action after the negotiated rate has taken effect.

This petition requires the court to determine whether the negotiated contract between Alliance and its shippers calls for FERC approval of a rate change, and the history of the contract bears upon our analysis. The earliest form of the agreement was executed while the pipeline's application was pending for the certificate of public convenience and necessity that would allow it to operate. In this preliminary contract, called the Precedent Agreement, the parties agreed to a negotiated rate in lieu of a recourse rate. The agreement provided that "[c]hanges in [Alliance's] operating costs will be reflected in its rates from time to time." Open Season Precedent Agreement, sched. C., at 3. No language in the

Precedent Agreement called for FERC approval of changes to the negotiated rate.

Even so, the proposed tariff Alliance filed with its Certificate Application suggested that Alliance would need FERC's approval for any changes to the negotiated rate based on changes in its operating costs: "The Negotiated Rates are determined using actual operating and maintenance costs . . . *approved by the FERC from time to time*." Certificate Application, Pro Forma Sheet 8 (emphasis added). FERC directed Alliance to remove that language from its tariff, explaining that such a provision belongs more appropriately in the parties' Transportation Agreement, which they would sign after FERC issued Alliance its certificate. *Preliminary Determination*, 80 FERC at 61,599. Thus, if the parties wished, they could provide for FERC review of negotiated rate changes in their contract. *See id.* Otherwise, prior approval from FERC would not be forthcoming. After FERC awarded Alliance its certificate, the parties executed the Transportation Agreement, replacing the Precedent Agreement. Alliance and its shippers included no language in that contract providing for FERC review of negotiated rate changes. Rather, the Transportation Agreement simply repeated the language previously agreed to: "Changes in [Alliance's] operating costs will be reflected in its rates from time to time." Transportation Agreement, App. B.

Since pipeline service began in 2000, Alliance has charged the negotiated rate, which it has periodically increased—without FERC's prior approval—to reflect changes in its operating costs. From 2003 to 2007, these annual increases averaged 2.5%. Each year the recourse rate was higher than the negotiated rate, until late 2007 when Alliance sought to increase the negotiated rate by about 6%. For the first time, the negotiated rate exceeded the recourse

rate. And for the first time, PPM Energy, Iberdrola's predecessor in interest, asked FERC to reject the filing on the grounds that Alliance's proposed rate increase "failed to satisfy both the rate-change requirements under the negotiated rate agreements and FERC's basic requirements for such filings." Petitioner's Br. at 11–12.

FERC denied PPM's request, concluding that the Transportation Agreement, as did the Precedent Agreement before it, allowed Alliance to change the negotiated rates to keep pace with increases in operating costs without prior review from FERC. *See Alliance Pipeline, L.P.*, 121 FERC ¶ 61,309, at 62,681 (2007). The Commission reminded PPM that FERC had "specifically stated in its certificate order that it would not review the level of Alliance's negotiated rates nor the method by which they were calculated." *Id.* PPM requested rehearing, arguing that despite what was put into the written agreement both parties understood that Alliance could only change the rate if FERC first approved the new operating costs. *See Alliance Pipeline, L.P.*, 122 FERC ¶ 61,250, at 62,428 (2008) [hereinafter *Rehearing Order*]. Denying rehearing, FERC explained that negotiated rate customers are entitled to what they bargained for and no more. *Id.* at 62,431. The Transportation Agreement did not entitle PPM to FERC review of the proposed rate increase before it took effect, though PPM could still challenge the rate under section 5. *See id.*

After succeeding to PPM's rights under the Transportation Agreement, Iberdrola filed a timely petition for review in this court, which we have jurisdiction to consider under 15 U.S.C. § 717r(b). *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

**II.**

Iberdrola argues that the parties intended that FERC would review Alliance's rate changes under section 4 at the time they are filed. FERC and Alliance argue that Iberdrola's predecessor in interest bargained away such review in the Transportation Agreement when it chose a negotiated rate over the recourse rate and made no provision for FERC review. Absent such an agreement, FERC would only review the rate in a section 5 challenge, which Iberdrola has not made. In the orders on review, FERC found that the parties had agreed that FERC would not review Alliance's rate changes, and we must decide whether that interpretation was arbitrary or capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A); *Old Dominion Elec. Co-op., Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008). We begin by "consider[ing] de novo whether the [contract] unambiguously addresses the matter at issue. If so, the language of the agreement controls for we must give effect to the unambiguously expressed intent of the parties." *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003) (internal quotation marks and citation omitted). If we find the contract ambiguous, "we give *Chevron*-like deference to [FERC's] reasonable interpretation" of the agreement. *Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 982 (D.C. Cir. 2009).

FERC read the Transportation Agreement to allow Alliance to alter its negotiated rates to keep pace with changed operating costs without FERC's prior approval. The contract states, "Changes in [Alliance's] operating costs will be reflected in its rates from time to time." Transportation Agreement, App. B. This language indicates that Alliance will adjust the rate as its operating costs fluctuate. No mention is made of a role for FERC. This contrasts sharply with the

phrasing of the recourse rate provision in the Precedent Agreement, which acknowledged FERC's role in approving rate changes: "Shippers electing recourse rates agree to pay such rates, *subject to changes determined by the FERC from time to time*." Open Season Precedent Agreement, sched. C., at 3 (emphasis added). Of course, Iberdrola neither chose the recourse rate nor bargained for similar language in the negotiated rate agreement. Because the parties made no provision for FERC approval of changes to the negotiated rate, we agree with FERC. The Transportation Agreement does not require that Alliance obtain FERC's approval before adjusting its rates, and FERC correctly declined to do so.

In the face of this plain language, Iberdrola argues in its briefs that the contract is nevertheless unclear. Iberdrola finds ambiguity not in what the contract says, but in what it does not say. Iberdrola argues that the lack of any mechanism to challenge how Alliance calculates its operating costs, which can trigger rate increases, creates ambiguity. *See* Petitioner's Br. at 43; Oral Arg. Recording at 9:46–10:13. But a contract is only ambiguous if it is "reasonably susceptible of different constructions or interpretations." *Ameren Servs.*, 330 F.3d at 499 (internal quotation marks omitted). We do not doubt that such a mechanism would be of benefit to this shipper and might lead to greater clarity regarding the basis of the rate change. But that is not the deal that was struck, and we fail to see how Iberdrola's argument casts any doubt on the question before us: whether FERC must approve such rate changes. In any event, at oral argument, Iberdrola effectively contradicted its briefs and conceded that the contract is unambiguous. The court asked Iberdrola's counsel, "So you have to go outside [the Transportation Agreement] to find ambiguity?" Iberdrola responded, "Yes." *See* Oral Arg. Recording at 6:23–:30.

Iberdrola finds ambiguity outside the contract in the previously discussed language from Alliance's Certificate Application, which indicated that Alliance would seek FERC's approval before adjusting the negotiated rate. This argument fails as a matter of law. "If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation." *Consol. Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C. Cir. 1985). "[I]f the intent of the parties on the particular issue is clearly expressed in the document, 'that is the end of the matter.'" *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1572 (D.C. Cir. 1987) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). Such is the case here. The contract's plain language settles this matter. Even if we were to consider this extrinsic evidence, it is of no help to Iberdrola. Both parties were aware that FERC had instructed Alliance to remove that language from its tariff and to include it in the Transportation Agreement if the parties wanted FERC approval for any negotiated rate changes. They were, therefore, on notice that FERC would only review rate changes if the parties included such a provision in their contract. Their knowledge of how FERC would read the contract is the most probative piece of extrinsic evidence of the parties' intent, and it cuts strongly against Iberdrola.

Iberdrola argues in the alternative that even if it loses on the contract interpretation issue, FERC has unlawfully abdicated its obligations under section 4 by permitting Alliance to update its negotiated rates without prior approval. *See* Petitioner's Br. at 26–32. But this argument ignores the fact that the premise of the negotiated rate regime is that FERC will not review freely negotiated rates, which are presumed to be reasonable when a recourse rate is also offered. *See Policy Statement*, 74 FERC at 61,239 (stating that FERC "would dispense with cost-of-service regulation for an

individual shipper when mutually agreed upon by the pipeline and a shipper"); *cf. Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 852–53 (D.C. Cir. 2008) (noting that FERC must "presume that the rate set out in a freely negotiated . . . contract meets the 'just and reasonable' requirement imposed by law"). By selecting a negotiated rate, Iberdrola's predecessor intentionally avoided section 4 review to obtain greater rate flexibility and (at the time) lower rates. FERC's requirement that Alliance offer the recourse rate gave Iberdrola the choice of a FERC-reviewed rate. Iberdrola's predecessor rejected that option, and Iberdrola raises no argument that persuades us to part company from the well-established rule that freely negotiated rates are presumed just and reasonable.

Iberdrola also argues that the FERC orders are unlawful because they permit a rate change pursuant to a contract that does not satisfy the NGA's "specificity" requirement. This rule mandates that a pipeline's tariff include either a clearly specified rate formula or the actual rate being charged. *See NorAm Gas Transmission Co.*, 75 FERC ¶ 61,091, at 61,309 (1996). The specificity requirement exists to ensure that other shippers can observe prevailing rates so that they might detect unlawful price discrimination. *Cf. Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990) (noting that the "duty to file rates with the Commission . . . [has] always been considered essential to preventing price discrimination"). Iberdrola's argument fails because Alliance has, in its tariff, filed the actual rate being charged at all times. That was all Alliance was required to do. Any shipper could view Alliance's tariff and determine the prevailing rates, which were filed in advance of any new rate taking effect. *See Rehearing Order*, 122 FERC at 62,429.

Finally, Iberdrola contends that FERC's interpretation provides Alliance *carte blanche* to raise its rates at will, suggesting that Alliance may have manipulated the calculation of its operating costs to artificially increase the negotiated rate. *See* Petitioner's Br. at 30–31. But even this possibility does not entitle Iberdrola to the section 4 review its predecessor bargained away. Nonetheless, Iberdrola is not without a remedy. Iberdrola can always obtain relief from the courts in a breach of contract action. Likewise, Iberdrola can always challenge a rate change it thinks unreasonable in a section 5 action. At the end of the day, Iberdrola wants more than the FERC scrutiny of Alliance's new rate available in a section 5 challenge. Iberdrola wants the section 4 review that its predecessor failed to include in its contract with Alliance. We cannot vitiate a properly executed contract, which one party now regrets having entered.

By electing a negotiated rate, Iberdrola's predecessor in interest calculated that the bargained-for rate would offer a more profitable arrangement than the recourse rate. That the negotiated rate now exceeds the recourse rate does not entitle Iberdrola to FERC review of Alliance's rate changes. Iberdrola's predecessor executed an unambiguous contract, leaving the shipper exposed to Alliance's reported changes in operating costs. As Alliance appropriately notes, "The fact that Iberdrola, in hindsight, considers its predecessor's bargain unwise is no reason to disregard the contract's clear meaning." Intervenor's Br. at 22. FERC enforced the contract as written. The Commission, therefore, did not act arbitrarily or capriciously by rejecting Iberdrola's protest of Alliance's negotiated rate change.

12

## III.

For the foregoing reasons, the petition for review is

*Denied.*